And we'll next hear argument in Berry v. Stillen. Have you folks worked out a game plan? We have, Your Honor. I'll be doing the bulk of the staging, but reserving time for larger Mr. Hogan. Yes, Your Honor. Timothy Hogan on behalf of the Plaintiff Appellant Cross Appellee. Your Honor, if it pleases the court, I would like to reserve a few minutes for rebuttal. Thank you. This is one of those rare cases that starts getting a Roman numeral at the end. I'm hoping that this may be the end of it. And that'll depend a lot on what the court does, I suppose. The beginning of it, Mr. Berry loaned a copy of a complex freight control system to Hawaii's wholesale grocery company. He did that in 1999. He protected three of his works by filing registrations with a copyright office. And the rest of his works, hundreds of works, he protected with a EULA. Let Fleming have it. His former employees were the ones that were going to run it. They were going to get a job out of it and continue to work, while Mr. Berry reserved his right to make derivative changes in SCS logistics data, the Microsoft Access database that was the heart of the machine, of the system. It's already been proven that immediately Fleming began to infringe his work, didn't allow him to make the derivatives of his own work, and continued to do that until Mr. Berry brought a lawsuit. That lawsuit was the Berry 1 case that this court has ruled and affirmed in the memorandum opinion dated July 5, 2007, that affirmed Mr. Berry's ownership of his copyrights. We believe the copyrightability of FCS. And moreover, the fact that Fleming had no right to make derivatives of FCS. Jury verdict, March 6, 2003. Fleming, having just been told that making a derivative of FCS was willful infringement by a jury, did it again. They took the derivative copy that they had, they broke off auxiliary logistics data.mdb, a derivative owned by Mr. Berry, and then created what they claimed to be a clean copy of FCS logistics data. They then ran that after they filed bankruptcy on April 1, three weeks after the jury verdict, prior to an injunction being entered. They ran that for a period of time. They claimed, and the district court agreed, that their actions of creating a derivative immediately after finding a jury found making a derivative was willful infringement, raised no issue of fact as to whether their conduct was willful. I would offer that they haven't put anything forward to say it wasn't willful. That you've just heard that you can't make a derivative, the first thing you do is make one. How you can say that isn't a willful act is beyond me. I don't think the district court should have made that decision. They had the right to go back to square one, yes? Only if they didn't have to get there through a derivative, Your Honor. Okay, hold on a second. You've got to speak English to me. I'm not a computer scientist, okay? So they had the right through the license to go back to the original licensed program, right? If they had a copy. If they had a copy. They didn't have the right to make one. A recasting of the work is reserved to Mr. Berry under 106 of the Copyright Act.  Well, wait a minute. You licensed them. You gave them a license to use the 2003 version. No, we gave them a license to use the one... I didn't say... It was SCS 1993 was the name of the version. Sorry, you're right. But you gave them a license to use that, right? That's correct. Okay, so what they tried to do after the jury verdict, what Dillon tried to do was to go backwards and scoop out the derivative additions, the modifications that he had made to the original. And he said, I goofed up. I got out the big one, but I forgot a couple of minor modifications. And that's what the district court bought into as being accidental and not deliberate. Exactly, Your Honor. And what I'm saying to this panel is when they scooped out those pieces, that took a work owned by Mr. Berry, the derivative they created, and made a new piece of software, which is another recasting of his work, reserved to him by Congress. If they had scooped out all of the modifications, would that still be your position? Yes, it would be, Your Honor. He owned that derivative. How? It's going back to the original. Because it wasn't the original. They did not have a legal copy of software. If you went into a store and bought a copy of Windows and were able to reload it on your computer, after you found that some change you made to it, yes, you have a copy of Windows. They didn't have that. All they had were illegal derivatives. They admit that. What they did is they took off the derivative copies. And what I'm saying is a matter of law, that derivative is Mr. Berry's. 106 reserves that to him. They had no ownership rights in it whatsoever. They won on that point, right? They did. So that's not the issue. The question was willfulness. And the evidence showed that they thought it was okay to go back to what the jury in the first case had said was the copy that they still had a license to use. So we're not talking about whether it was an infringing derivative because the court already held it was, correct? Well, the court ignored the auxiliary logistics data entirely and wouldn't address the fact that making that two-part database now was an act of infringement. The court agreed with Mr. Dillon that he owned that, which he didn't. Mr. Berry owned that. They continued to use it. It was a derivative. The court then focused on the one that was left, the one that he said was almost like the one that Mr. Berry licensed but wasn't, and said there was a few things left. He tried his best, and that wasn't willful. Well, what I'm saying is they're running auxiliary right now. That is owned by Mr. Berry. Are you talking about the other half of the legal system? Yes. Exactly, Your Honor. Which consists of what? What Dillon did is he took Mr. Berry's system and made many changes to it. He took what he took. He took what he did. When he got to it, what his testimony is is he stripped off the parts that were illegal, that were willful infringement, put them in a subsidiary database that he called auxiliary logistics data.mdb. He then took the other one that he called original logistics data.mdb, and that's the one he said that he had accidentally left some pieces in. He ran them together for a period of time as two subsidiary databases. This is during the period prior to the sale to CNS. He ran those, and my argument has been that that's illegal. That's a willfully created derivative copy of Mr. Berry's work, whether split or otherwise, that he owned, that he never licensed, and that's what they were running during the bankruptcy. Willful infringement owned by Mr. Berry that has been sold to CNS. That's the willful part. Then they get to the point where they need to sell everything to CNS. We're talking about May. They bring in guidance, guidance software. Ms. Bronster will be arguing for guidance. Guidance, without contacting me, while there's an order saying that nothing should be destroyed, there's an SEC investigation going on, goes into the facility in Hawaii and alleges to do a forensics job. We believe a reasonable jury would find exactly what had happened was they simply created a false affidavit, filed it in Delaware. The sale went through, selling all these subsidiary works, including auxiliary, and the spreadsheets, we'll talk about that later, to CNS. Later on, they admit they were wrong. Those things were sold to CNS. They were on the computers. So now CNS has all the copies of Mr. Berry's works protected by the EULA that said, I'm going to let you borrow these, but you've got to protect them. This is my work. They sold them. They never contacted me to say, Mr. Hogan, we're going to do some forensic work out here, because I would have run into court and said, this is stayed. I want to get the magistrate involved. They didn't do that. They then go in, and the one thing they find is the 4.6 gigabyte copy of the actual database, a massive database, disappeared. Now, the court found that, if I'm recalling correctly, that this was a fair use by guidance because it was for litigation purposes. Now, are you arguing that it's not fair use, or what's your argument on the fair use issue? My argument is simply this. Guidance was brought in to create a subterfuge, and that's not fair use. The guidance report was used in Delaware, not in the Hawaii case, as they say in their brief. It was used in a case that Fleming filed against Mr. Berry and me to prevent us from reporting them to federal law enforcement in the bankruptcy case in Delaware. That's where the report was used. A small individual developer faced one of the largest bankruptcy cases in the country, immediately tried to put him in the position where he's defending himself in Delaware. That's where guidance's report was used. It was being created for litigation. Now, if they get the fair use, and I'm not saying that forensics people shouldn't get fair use. I'm not going to argue that. But they violated a rule, an order of court. They did it in an SEC investigation, and they didn't even contact opposing counsel, and the stay was in effect. And I think when you add those up, this is the case to not apply blanket fair use to their conduct, particularly when they concede that the affidavit they filed was false. They say it was a mistake. It's still false. Okay, Fleming gets in close. They've got to sell their division. The only one that's really valuable is the Hawaii division, but they have to sell the Berry software with it. They can't. They won't even come to Mr. Berry to try to. So what they do is they take an infringing derivative copy, the one that the district court has found to be infringement, and they then extract 17 tables from it. My expert, Philip Johnson, Ph.D., says they copied the structure of his database. These were choices, Berry's affidavit. These are all things I decided to put into it. The difficulty with Johnson's report is that it is extremely general and does not in any sense conduct an analysis of what's similar, why, with respect to the structure and the relationships between the structure and other tables. Well, I think the easy way is, Your Honor, there's nobody doubted that they copied it from the database. There's no circumstantial proof being. Well, there's no doubt they extracted data. And data is not copyrightable. So then you get down to what's left. I mean, you talk about the structure by which I take it. You mean certain files and tables and lines directing you from one title to another. What Professor Johnson did is he pointed to Berry's declaration that had the actual queries. I've read both of them like four or five times, and I confess. That's why I'm asking you the question. I confess to being pretty illiterate in this language. But where is there any? You put Johnson's declaration up against Walker's, and there's hardly any comparison in a level of specificity. That's exactly why I asked for Rule 56-F, Your Honor. When I put mine out in the April 12th order, the court said it raised an issue of fact, that Johnson did. I filed a motion on time, and they filed with seven days for me to respond that report. Well, that doesn't have any. I mean, Johnson, you had the stuff. I mean, so Johnson's declaration is whatever it was going to be. Well, his declaration said they copied 17 tables from Berry's database and put it in their spreadsheets. That's what he says in his report. What 17 tables? And what significance were the 17 that they copied? And to what extent were they just driven by the necessity of the business in which these folks were engaged? I mean, you're naturally going to have when the container was shipped from some place, you're naturally going to have a customer name. I mean, that's surely not copyrightable. Of course it's not, Your Honor. Okay, so then if I look at Johnson's declaration, what do I find that is? Professor Johnson said that the choices that Berry made to make these tables may not be tremendously creative, but they were his choices. Berry's affidavit said these were not driven by anything. I chose to do it. I created another system that does the exact same thing that doesn't have any of this in it. That proved that it doesn't have to be in there. Now, I admit that Professor Johnson's report was sufficient to defeat on summary judgment another party, but I only had seven days to respond to Walker, and in his report he says that the reason he even says some of these are protected, but they're not registered properly. He even admits they're protected, but not registered. That's wrong. That's not how you get a copyright. Copyright rises when it's first fixed in any tangible form. Professor Johnson's report was simple because this wasn't a case where you've got to wonder whether they actually copied it. Did they have it accessed? They admitted they copied it from his work. The real thing, Your Honor, is that EULA said you can't do that. Secondly, if you could do it, they didn't have a legal copy of software to do it with. They used an infringing derivative. That's already been determined. It hasn't been appealed, Your Honor. As to the fees issues, Your Honor, Mr. Berry, well, let me go to the injunction. I see my time is running out, Your Honor. I think we're just going to have to spill over just by maybe another minute to finish up. Your Honor, Mr. Berry has never had an injunction. They've got his works. We put in the record in the motion for permanent injunction that Mr. Dillon says his work doesn't have job ID in it. That's the one he says he created, the spreadsheet. And we put in e-mails where they're using a work that has job ID in it. They've got his. They're using the database, the one they claimed they never were going to use again. We put that evidence in. He's entitled to have an injunction. He's entitled, I believe because of the EULA, to not have them go and create a new work. That's all he got was the promise to protect his trade secrets. That's the only consideration he got. It was a one-of-a-kind work. He protected it from vertical software. The only people who really can use it are CNS. It's built for that facility. They gave it to them. The only thing he had in return from them is a promise not to use it. He required his employees sign off on trade secrets. He put it in the EULA. Fleming agreed in the second addendum that the work that Dillon made and that they gave and sold to CNS is owned by Barry. And I think that's where it should end, Your Honor. Thank you. Okay, thank you. Mr. Hogan. Good morning, Your Honor. It's Michael Bellman on behalf of the Post Confirmation Trust. Marjorie Bronstra, I'll reserve three minutes for her representing guidance. I will also be speaking on behalf of Lex Smith, who represents CNS and the various CNS defendants, and Mr. Lyle Hosoda, who represented the individual employees who were named below. Your Honor, there's so much in the record that I think can and should be addressed. But let me go to what I think is the fundamental issue, which is that there is a well-articulated standard for determining whether or not the Excel spreadsheets that were being used from June 9th forward. Now, this is here. Fleming has switched from using anything that has to do with FCS, the software that was developed by Mr. Barry, to an Excel spreadsheet system. The court looked at three different times, motions for summary judgment by various defendants. The first was in January of that year, and it was a motion by Mr. Dillon and Ms. Noah, who had been named individually. They sought summary judgment saying that they could not be guilty of copyright infringement after June 9th because they had stopped using Mr. Barry's software. Mr. Dillon had developed these spreadsheets, and the only thing that he did that was given to the defendants in discovery, plaintiffs in discovery, was to extract the data owned by Fleming that was put in by Fleming employees. They are the ones who inserted the data into that work. He extracted it and put it into the spreadsheets. The court granted summary judgment in favor of Mr. Dillon at that point. There was no Rule 56-F request. There was no claim that there was a need for additional expert testimony by Mr. Barry or Mr. Hogan at that time. There was no error when the court ruled with the very person who developed the spreadsheets that these were not infringing. There are subsequent motions that are brought by the additional employees. They were denied without prejudice because, at that point, the second Johnson report, very thin on conclusions, but the judge said, okay, you've come in with a report. It's enough for me to deny the motions, cross motions for summary judgment without prejudice, but we're going to allow additional time for depositions of the experts and for you to bring new motions, which the parties did do in June. And at that point, consistent with the position that Mr. Barry and Mr. Hogan have taken throughout the litigation, they did not perform the analysis that is required under the Apple case. They did not look to see what were the protected elements. They did not identify them, which is their obligation. They did not show what was the same in the Excel spreadsheets as were in the Barry FCS, and they did not do any of the analysis necessary to show that they were entitled to any protection whatsoever, that there was anything at all infringing about the Excel spreadsheets. Defendants, on the other hand, the court noted, the court below said, you know, it's your burden and you failed to do it. That's enough to grant summary judgment. But the defendants have gone further. They have actually produced an analysis consistent with the law and demonstrated that, in fact, there are no infringing elements of the Excel spreadsheets. And so on two alternative bases, she granted summary judgment. So there was no infringement after June 9th, and it's only after June 9th, frankly, that the plaintiff sues the Post Confirmation Trust and CNS. The reason that I raise that is because there is no evidence. Mr. Hogan got up and said, and we have been through this record, including on Father's Day, which is a little bit annoying, although thank you for holding the hearing in Hawaii, but there is absolutely no record evidence that any files of Mr. Hogan's and Mr. Berry's were ever transferred to CNS. Now, the court made that determination in the summary judgment rulings, but not just in the summary judgment rulings. After the trial on the damage phase, after there was no longer any question about any materials no longer being available to Mr. Berry, the court had a permanent injunction hearing, at which point the claim was once again that Fleming had transferred the software of Mr. Berry to CNS. And the court said there's no evidence of that. Not only is there no evidence that CNS didn't infringe, but on this claim that he has repeated over and over and again repeats here on appeal, he makes the bald, unsupported statement that software was transferred. We put in the records, Your Honor, the hearing in the Delaware Bankruptcy Court where Mr. Hogan was present on behalf of Mr. Berry objecting to any transfer of software to CNS. The court said no software is being transferred. It's not being sold. The fact of the matter is that on this essential element of his claim, for him to stand up now and tell you again at the appellate level that there's record evidence below that it was transferred to CNS is just flat-out false. It's not true. There is no record evidence of that. On the issue of Willful, I think Your Honor asks exactly the right question. The undisputed testimony, including e-mails that were back and forth between the employees following the original verdict, was one of the jury determinations that is consistently ignored by the other side was that a free license existed for the use of the Berry FCS software. And they had made changes. It's true the jury said you can't do that, but they went back to pluck the changes out. Now the judge ruled in their favor and said your inability or failure to have removed all the changes now makes you subject to a claim for infringement. They won on that. But on the issue of willfulness, was there an intent to violate the copyright laws by any of these individual employees when they did that? The answer clearly is no. There's no evidence whatsoever that they intended to do anything but get back to the licensed version. But even then, by June 9th, the 70-day window period, they stopped using it entirely. They just stopped using it in its entirety. And the reason that I think that's significant is the one point on appeal for our side in this, which has to do with the prevailing party standard. Here you have a plaintiff who has filed a suit after a time when Fleming has developed an alternative software that it uses on its own, the Excel spreadsheets, that is not infringing. It is a claim of these individuals that it was infringing because we took data out of the Berry FCS, our data, and moved it into the Excel spreadsheets. We had to defend that claim. I mean, that is what we were now using. It was that or not use anything in the interval, which would have been their preferred choice, or enter into being held hostage, frankly, to whatever license fee he now wanted to charge if we couldn't remove our data from his prior system and shift it to the new system. Now, on the issue of whether or not we infringed by having the Excel spreadsheets, the answer clearly was no. We went on summary judgment. And yet, as the prevailing defendant on the primary argument that was being made against us, the highest risk issue, the court below determined that we were not the prevailing party. Because of this one inadvertent period of time for that 70 days, during which not all of the changes had been removed. And the court, instead of looking at it and, as the Supreme Court has said and as this court has said, treating plaintiffs and defendants the same under the copyright laws, we were not treated the same. If you look at Buchanan and that line of cases that applies it in the copyright area, they're primarily addressing issues where do you have enough of a court action to justify considering yourself a prevailing party. And here we clearly did. We have a judgment entered in our favor for after that period of June 9th that these spreadsheets are Fleming's. They were Fleming's to sell. They're CNS's to use now. And they are non-infringing. Now, that clearly beats any standard for a prevailing party. But we have, if you think of it as a matrix, on the one issue of the FCS in that 70-day period, the plaintiff wins, gets $56,000 on his $50 million claim. On the issue of what we're actually using at the time he sues us, we win and are allowed to use it and continue to use it. But because he won on one issue, the defendant has won on one issue, the court ignored that and said we don't have to consider that on prevailing party. And the only thing I can think of is that she was looking at the Buckhannon line of cases and saying all that the plaintiff need do is win on one. It doesn't matter if he lost on one, won on one, and it doesn't matter which is the most important. She did take it into account quite correctly when she decided in analyzing the request for attorney's fees whether or not in her discretion he should be awarded attorney's fees and correctly, in my view, decided he should not. But again, I would submit that for this area of law and looking at how a determination should be made when there is, I wouldn't call it a split decision, but let's call it a split decision where you win on one thing and it's significant to the company. Why is that not a situation in which the defendant is a prevailing party as well and you then go to the discretionary factors to determine whether or not there should be a fee award for the defendants? There was just that one claim. There was the copyright infringement claim, and then he did win on infringement. The court found there was infringement. So there weren't like separate claims for these different issues. Have you seen cases which have upheld a prevailing defendant, as you were saying, on different parts of the same claim? I've seen it with different claims, but not with different parts of the same claim. Well, here again, I believe, I'd have to go back to the second amended complaint, but I believe by the time of the filing of the second amended complaint, it was clear that we were not using his FCS, and I thought he had two independent claims for those two separate time periods, one of which was that you were using an FCS derivative during that window of time, and the second claim was that the spreadsheets, which were clearly not the same thing, were an illegal derivative. Now, he has the same copyrighted material, but he's making clearly two separate and independent claims based on it. Now, whether he made it that clear in the second amended complaint, I can't stand here and tell you now that that is the case, Your Honor. It's not entirely clear to me that he did. But I would think that when you're dealing with this, here what we've indicated was our right to use our own data and to remove our own data and to develop an alternative competing work that we didn't have to pay a license fee to Mr. Berry for. And even though he may have been asserting a claim based on the same underlying copyrighted material, they clearly were two distinct claims. In fact, I think in his brief here on appeal, he makes it very clear that he was asserting two different theories, two different causes of action or claim for copyright infringement, one based on the alleged similarities between the spreadsheets and the original Berry FCS and one based on the failure to remove to get back to the license-free version that he had originally put on our system. I've agreed to reserve three minutes of time. I guess that would slip and give everybody an extra minute. There's one other issue that I would like to get in. This is the misappropriation of trade secrets. And here on this issue, the court quite correctly found that he failed to identify any trade secrets, that he failed to identify any basis on which they had independent economic value. There was no evidence whatsoever contrary to what was submitted on the summary judgment papers. But more to the point, again, this goes back to why I'm somewhat indignant about this. And that is that the court pointed out, and I am still nowhere in his brief has he pointed to a single bit of evidence that the alleged misappropriation, which was that Fleming supposedly handed this to CNS or sold it. There is no record evidence of that. The judge pointed it out below on at least two separate occasions in rulings, and there still is no evidence that that actually occurred. You're going to have a very indignant co-counsel if you—  Thank you very much. Thank you, Mr. Bowman. I'm not sure I should thank him. Ms. Bronster. Thank you very much. I did request a reservation of some time in order to address issues relating to guidance and to Michael Gersey. And this was done out of an abundance of caution to see if any of you have questions about it. But I actually believe that when Mr. Hogan admitted that he is not arguing that forensic experts don't get fair use, I think we're pretty much where guidance needs to be. The court below properly found that what guidance was doing was taking images for the purpose of litigation. And the fact that there was litigation ongoing in Delaware was support to that. So if forensic experts such as guidance and Michael Gersey have the right to rely on fair use, then none of the allegations that Mr. Berry has asserted get over that standard, particularly since what Mr. Hogan argued was that what guidance did was simply participate in a subterfuge in order to get the transfer of the information and the copywritten material to CNS. But as Mr. Baumann pointed out and as the court recognized, there was no evidence of that. And at the point at which the court ruled was at summary judgment. The court should have and could have stated you need more than simply mere allegations in order to get over what she found, which was the fair use. And we believe that Mr. Berry failed in his burden at the summary judgment stage to come up with anything more than bald allegations unsupported by any evidence. And for that reason, we believe that the case should be affirmed with respect to the guidance decision. All right. Thank you, Ms. Braunster. Mr. Hogan, to wrap up. I'm bringing my record up with me. There are my glasses. Mr. Baumann, Your Honor, Timothy Hogan, may it please the court. Mr. Baumann made the statement that there was no evidence and it was echoed by Ms. Braunster that the works were transferred. There was a ton of evidence. Twenty-three thousand file names were submitted, a diskette, voluminous data, identified by Mr. Berry in his affidavits as being the names of his files, containing the names of his files. The district court said that doesn't prove they're yours. So if you have a copy of Windows.exe on a drive, the district court would say that has no proof whatsoever that it's Windows. I would say, Your Honor, it raised an issue of fact. It should have gone to the jury. We should have at least gotten the data, which we never did prior to the court ruling. As to Mr. Baumann's claim that there was no evidence, I point the court to my excerpts of record 629. We asked Mr. Dillon under oath, was there a job I.D. in your work? He says no. Subsequent e-mails put before the court that were subsequent to the time there was never going to be Mr. Berry's database on anybody's computer, everyone talking about job I.D. The excerpts of records E633, 634, 635, 636, and it goes on, Your Honor. This is evidence that they're running the database. The one they claim, oh, we've got away from that. We don't want to use that. All right. Sorry, Your Honor. Am I done? You're done. Thank you, Your Honor. Thank you very much, Mr. Baumann. Thank you, counsel. The matter just argued will be submitted and the court will stand in recess for the morning. All rise.
judges: Goodwin, Rymer, Ikuta